1 TERRY E. SANCHEZ (State Bar No. 101318)
Terry.Sanchez@mto.com
2 KATHLEEN M. McDOWELL (State Bar No. 115976)
Kathleen.McDowell@mto.com
3 JOEL M. PURLES (State Bar No. 266208)
Joel.Purles@mto.com
4 MUNGER, TOLLES & OLSON LLP
355 South Grand Ave.
5 Thirty-Fifth Floor
Los Angeles, CA 90071
6 Telephone: (213) 683-9100
Facsimile: (213) 687-3702
7
VICTORIA L. BOESCH (State Bar No. 228561)
8 Victoria.Boesch@mto.com
MUNGER, TOLLES & OLSON LLP
9 560 Mission Street, Twenty-Seventh Floor
San Francisco, CA 94105-2907
10 Telephone: (415) 512-4000
Facsimile: (415) 512-4077
11
Attorneys for Defendants
12 MERRILL LYNCH, PIERCE, FENNER & SMITH
INCORPORATED and MERRILL LYNCH & CO., INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| BRADFORD SHAFFER,<br><br>    Plaintiff,<br><br>v.<br><br>MERRILL LYNCH, PIERCE, FENNER & SMITH, INCORPORATED; MERRILL LYNCH & CO., INC. and DOES 1-150, inclusive,<br><br>    Defendant. | CASE NO. CV-10-03943 CRB<br><br>**NOTICE OF MOTION AND MOTION FOR ORDER ON PRECLUSIVE EFFECT OF PENNSYLVANIA FINRA ARBITRATION AWARD**<br><br>Hearing Date: July 8, 2011<br>Time: 10:00 a.m.<br>Judge: Hon. Charles R. Breyer<br>Courtroom: 6, 17th Floor |

**TABLE OF CONTENTS**

I. SUMMARY OF ARGUMENT ................................................................................. 1

II. FACTUAL BACKGROUND ................................................................................... 3

    A. Formation of the Shaffer/Genoni Team. ........................................................... 3

    B. The Shaffer/Genoni Team Breaks Up. .............................................................. 4

    C. Shaffer Moves Accounts to Divert Team-Account Production Credits from Genoni to Shaffer. ............................................................................................. 6

    D. Merrill Lynch Works to Resolve the Shaffer/Genoni Dispute. ........................ 8

    E. Shaffer Tries to Negotiate a More Favorable Resolution, and Then Decides to Leave Merrill Lynch. ........................................................................................ 8

    F. Genoni Recovers Incentive Compensation from Shaffer — the Pennsylvania FINRA Arbitration. ............................................................................................ 9

    G. The California FACAAP Arbitration. ............................................................ 11

III. DISCUSSION ........................................................................................................ 11

    A. Pennsylvania Law Determines the Preclusive Effect of the FINRA Award. .. 12

    B. The Pennsylvania FINRA Award Satisfies the Elements of Collateral Estoppel. ..... 12

      1. The FINRA Award is a Final Judgment on the Merits. ........................... 13

      2. Shaffer Had a Full and Fair Opportunity to Litigate. ............................... 13

      3. The FINRA Award Actually and Necessarily Decided that Genoni was Entitled to the Incentive Compensation Shaffer Seeks to Recover Here. ................. 14

IV. CONCLUSION ...................................................................................................... 15

# TABLE OF AUTHORITIES

**FEDERAL CASES**

*Jacobs v. CBS Broad. Inc.*,
 291 F.3d 1173 (9th Cir. 2002) ........................................................................................ 12

*Witkowski v. Welch*,
 173 F.3d 192 (3d Cir. 1999) ..................................................................................... passim

**STATE CASES**

*Brinker v. Superior Court*,
 235 Cal. App. 3d 1296 (1991) ..................................................................................... 2, 12

*Dyer v. Travelers*,
 572 A.2d 762 (Pa. Super. 1990) .................................................................................. 2, 13

*Ottaviano v. Southeastern Penn. Trans. Auth.*
 361 A.2d 810, 814 (Pa. Super. 1976) ............................................................................. 13

**STATUTES AND RULES**

28 U.S.C. section 1332 ........................................................................................................ 12

| | |
|---|---|
| 1 | |
| 2 | PLAINTIFF BRADFORD SHAFFER PLEASE TAKE NOTICE that Defendants |
| 3 | Merrill Lynch, Pierce, Fenner & Smith Incorporated and Merrill Lynch & Co., Inc. (collectively |
| 4 | "Merrill Lynch") will move the United States District Court for the Northern District of |
| 5 | California, San Francisco Division, the Honorable Charles R. Breyer on July 8, 2011 at 10:00 |
| 6 | a.m. for an order according collateral-estoppel effect to the FINRA arbitration award arising from |
| 7 | the Pennsylvania proceedings in *Genoni v. Merrill Lynch, Pierce, Fenner & Smith Inc., et al.*, |
| 8 | FINRA Dispute Arbitration No. 07-02208. Specifically, Merrill Lynch seeks an order holding |
| 9 | that the Pennsylvania FINRA arbitration award conclusively determined that Saundra Genoni was |
| 10 | entitled to the incentive compensation that Shaffer again seeks to recover in this case. Merrill |
| 11 | Lynch bases this motion on the accompanying memorandum of points and authorities, |
| 12 | declarations, and exhibits as well as oral argument and all the records and files in this action. |

## I. SUMMARY OF ARGUMENT

In this case, former Merrill Lynch Financial Advisor ("FA") Bradford Shaffer brings claims of gender discrimination, constructive discharge and retaliation in connection with his August 2008 resignation from Merrill Lynch (to join a competitor, UBS). Those claims are meritless. They derive from a protracted and bitter dispute between Shaffer and his former teammate and fiancée, Saundra Genoni. The dispute concerned the terms of their team dissolution, specifically the division of production credits[1] (used to determine incentive compensation — sometimes referred to as commissions) from team accounts following dissolution.

Shaffer's instant case boils down to one central allegation: He claims that Merrill Lynch wrongfully paid Genoni $750,000 in disputed incentive compensation that should have been paid to him and, in doing so, discriminated against him because he is a man. But, Shaffer has already litigated the issue of whether he had a right to that incentive compensation and *lost*. He is bound by that result under principles of collateral estoppel (issue preclusion).

In mid-2007, Genoni instituted a Financial Industry Regulatory Authority ("FINRA") arbitration in Philadelphia, Pennsylvania (where she had previously worked for Merrill Lynch), seeking to recover team-account incentive compensation that she asserted was wrongfully paid to Shaffer. In that arbitration, Genoni sought to enforce the terms of a written agreement that she, Shaffer, and their manager, San Francisco Complex Director Jim Dullanty, had signed. Under that written agreement, she believed she was entitled to 50% of the production credits from team accounts following her departure from San Francisco (where the team had previously worked together) to live and work in Philadelphia. In her view, the agreement did not impose any obligations for her to continue working for the team, but instead reflected a fair division of ongoing production credits based on her prior work in building the team's book of

---

[1] Merrill Lynch awards FAs production credits based on revenue generated by accounts assigned to them. Those production credits are then factored into a formula that includes various adjustments and application of a payout rate used to calculate incentive compensation paid to the FA.

business. Shaffer counterclaimed, alleging (as he does here) that Genoni had been paid three quarters of a million dollars in team-account incentive compensation that should have been paid to him. Shaffer contended that Genoni should have received no team-account production credits following her move from San Francisco to Philadelphia because she had not continued to work for the San Francisco team.

In the Pennsylvania FINRA arbitration, the parties filed statements of claims, answers, motions, and trial briefs. They eventually participated in eight days of substantive hearings before a panel of three FINRA arbitrators. The arbitrators heard testimony from seven witnesses (including Shaffer, Genoni, and Dullanty) and received over 140 exhibits. Shaffer and Genoni each told their story through their own testimony, other witnesses, documentary evidence, and opening and closing statements by their counsel. The proceeding was transcribed in full. After all this, the FINRA panel awarded Genoni damages compensating her for incentive compensation wrongfully paid to Shaffer — in exactly the amount requested in her closing argument. It denied Shaffer's claims completely and, instead of splitting the hearing fees between the parties, ordered Shaffer to pay all of them. In a nutshell, the arbitration panel decided that Genoni — not Shaffer — was entitled to the disputed team-account production credits and the incentive compensation based on those credits.

The FINRA Panel's decision has issue preclusive effect in this case under Pennsylvania law, which applies because the arbitration took place there. *Brinker v. Superior Court*, 235 Cal. App. 3d 1296 (1991); *Dyer v. Travelers*, 572 A.2d 762 (Pa. Super. 1990). Pennsylvania law clearly allows Merrill Lynch, though not a party to the arbitration hearings, to assert collateral estoppel against Shaffer because he was a party to that proceeding. *Witkowski v. Welch*, 173 F.3d 192 (3d Cir. 1999). As such, Shaffer had a full and fair opportunity to litigate the issue of who was entitled to the production credits from the Shaffer/Genoni team accounts following Genoni's move to Philadelphia. And litigate that issue he did, thoroughly and aggressively, using the same counsel representing him here. He lost, however, and so collateral estoppel prevents him from re-litigating the issue in this case.

Of course, in addition to the Pennsylvania FINRA arbitration, Shaffer also brought

a California JAMS arbitration against Merrill Lynch to recover certain deferred-compensation benefits awarded him individually under the terms of certain Merrill Lynch contingent, long-term compensation plans. This Court recently confirmed the 50+-page award from that arbitration, which resolved only issues relating to Shaffer's individual benefits under those plans.

In short, issues surrounding Shaffer's compensation and departure from Merrill Lynch have been litigated to death. It makes little sense to waste this Court's resources re-litigating issues fully and fairly considered and decided by three FINRA arbitrators in the Pennsylvania arbitration. For this reason, Merrill Lynch respectfully asks the Court to give collateral-estoppel effect to the Pennsylvania FINRA award, holding that it conclusively determined Genoni's entitlement to the incentive compensation that Shaffer again seeks to recover in this case.

## II. FACTUAL BACKGROUND

The facts summarized below were presented to the FINRA Panel that decided Shaffer and Genoni's competing incentive-compensation claims. Many of the facts were disputed, and this Court need not determine those facts for purposes of this motion. The point here is to shed light on the extensive and complete record before the FINRA Panel and the Panel's decision based on that record. This will help the Court understand, for purposes of issue-preclusion analysis, (1) that Shaffer has fully and fairly litigated the incentive-compensation issues he also raises in this case and (2) that the Panel actually and necessarily resolved those issues against him through its arbitration award. *See Witkowski*, 173 F.3d at 201-03 (determining issues resolved by arbitration award for collateral-estoppel purposes by analyzing complaint and arbitration-hearing transcript).

### A. Formation of the Shaffer/Genoni Team.

Merrill Lynch hired Plaintiff Bradford Shaffer as an FA in January 1986. By 1994, he was working in San Francisco with his father, Ron Shaffer (a longstanding Merrill Lynch FA) as a part of the "Shaffer Team." In 1995, the Shaffer Team invited Saundra Genoni[2] — a

---

[2] At this time (and up until her marriage in 2005), Genoni was known as Saundra Gibson. For the sake of simplicity, Merrill Lynch refers to her throughout this brief as Genoni.

1  corporate stock-option plan specialist who had assisted them in obtaining corporate clients — to
2  join the team. *See* Ex. 1 at Ex. B ¶¶ 7-9; Ex. 2 at 93-95; Ex. 3.[3] Genoni accepted and moved
3  from the East coast to San Francisco to begin Merrill Lynch's training program to become an FA
4  and, upon completion, become an official member of the Shaffer Team. Ex. 1 at Ex. B ¶¶ 11-14;
5  Ex. 2 at 95-96.

Genoni contributed significantly to the team's book of business. About three years after moving to San Francisco, she secured a very large stock-option plan as a Merrill Lynch account. Ex. 2 at 98-103. This plan was one of the largest in the country (involving a deposit of $29 billion dollars in stock with Merrill Lynch). *See id.* at 103; Ex. 4 at 1. The contract lasted two years, during which time the Shaffer/Genoni Team developed significant private client business with employees of the stock-option plan client. That business remained after the contract expired. *See* Ex. 2 at 106-10. The team referred some such business to other FAs, receiving in return for its referrals a permanent percentage (generally 25%) of the production credits generated by resulting accounts, despite having no role in actively managing those accounts. *See id.* at 106, 108-10.

At some point in 1998 or 1999, Shaffer and Genoni became romantically involved and eventually agreed to marry. *See id.* at 104; Ex. 4 at 2. Shaffer broke off the engagement, however, shortly before the wedding date. Ex. 1 at Ex. B. ¶¶ 24-25; Ex. 5 at 51-52; Ex. 4 at 2. Despite this severing of their personal relationship, Shaffer and Genoni continued to work together on the Shaffer/Genoni Team. Ex. 1 at Ex. B ¶ 26; Ex. 2 at 124. During this time, Shaffer and Genoni agreed to split all production credits from the Shaffer/Genoni Team 50/50. Ex. 1 at Ex. B ¶¶ 28-31; Ex. 2 at 106, 125.

**B.      The Shaffer/Genoni Team Breaks Up.**

In early 2004, Genoni told Shaffer that she wanted to transfer to Philadelphia, Pennsylvania (where her family was located) for personal reasons. Prior to Genoni's departure, Genoni and Shaffer entered into a written Team Compensation Agreement in which they agreed

---
[3] Exhibit references are to numbered exhibits to the accompanying declarations of Victoria L. Boesch, one of which was submitted under seal.

to continue a 50/50 split on all production credits (and so the resulting incentive compensation) generated by the accounts then serviced by the Shaffer/Genoni Team. Ex. 6.

Under the Team Compensation Agreement, Shaffer and Genoni understood that all of those accounts would continue to be serviced from the San Francisco office — in accordance with Shaffer and San Francisco Complex Director Dullanty's insistence. *See* Ex. 2 at 126-35; Ex. 7 at 107-08. The Team Compensation Agreement provided that it would remain in effect until either Shaffer or Genoni left Merrill Lynch. Ex. 6 at ¶ 4. Shaffer, Genoni, and Dullanty signed this written agreement. *Id.* at pg. 3.

Shortly after signing the Team Compensation Agreement, Dullanty had second thoughts. *See* Ex. 2 at 135-36; Ex. 7 at 18-20. Dullanty described Genoni as dominating Shaffer and as "the aggressive offset to Brad Shaffer's happy-go-lucky personality." Ex. 4 at 5. He observed that, while Shaffer paid "no attention to details" unless he had to, "Saundra Genoni took care of all the details." *Id.* (emphasis original). Apparently concluding that Shaffer had not paid adequate attention to the details here, Dullanty believed that the written Team Compensation Agreement that all three had signed was too generous to Genoni. *See* Ex. 2 at 135-36, 147. He spoke with Shaffer and Genoni separately about changing its terms. *Id.* at 135-36; Ex. 8 at 38.

Genoni proposed that the team accounts be split, with half to be serviced by Genoni in Philadelphia and half to remain in San Francisco with Shaffer. *See* Ex. 9 at 3; Ex. 2 at 133-34. Dullanty, who would have suffered a loss of income if half the team's accounts went to a Philadelphia office, rejected this solution out of hand. Ex. 7 at 107-08.

Shaffer and Dullanty claimed that Dullanty then voided the Team Compensation Agreement, but Genoni maintained that he simply asked her to reconsider its terms. *See* Ex. 2 at 135-37, 144-48; Ex. 10 at 194-195; Ex. 7 at 25-27. All agreed that Genoni, Shaffer and Dullanty discussed adjusting the Team Compensation Agreement by (1) reducing Genoni's production-credit percentage (to 40/60 for a limited period) for one account, (2) adding sunset provisions that would phase out Genoni's 50/50 production-credit splits on other team accounts over five years, and (3) retaining the 50/50 split in perpetuity for third-party administered accounts. *See* Ex. 2 at 147-48; Ex. 7 at 101-02; Ex. 8 at 38-41; Ex. 11; Ex. 4 at 3. Shaffer and Dullanty asserted that,

following these discussions, Genoni and Shaffer reached a new verbal agreement. Ex. 7 at 101-02; Ex. 8 at 40. They further contended that Genoni agreed to draft a new written agreement for all to sign, but that she never did so. Ex. 8 at 40-41; Ex. 4 at 3. Genoni insisted that she considered the terms of the oral proposal but eventually decided to adhere to the Team Compensation Agreement (which stated that any amendment must be in writing). *See* Ex. 2 at 147-48; Ex. 11; Ex. 6 at ¶ 8.

While Genoni asserted that the written Team Compensation Agreement governed, Dullanty believed that the verbal agreement should have been enforced. *See* Ex. 12 at 190-193; Ex. 11; Ex. 7 at 149, 159-60. As a practical matter, enforcing the verbal agreement instead of the written one would have made little difference. The alleged verbal agreement altered the production-credit splits only slightly during the mid-2004 to mid-2008 timeframe (i.e. the time following dissolution of the team when both Shaffer and Genoni still worked at Merrill Lynch). That verbal agreement therefore would have made little difference in the amount of incentive compensation allocated to each during that time. *See* Ex. 4 at 3; Ex. 12 at 189-93, 207.

Shaffer, on the other hand, maintained that neither the written Team Compensation Agreement nor the alleged verbal agreement should be enforced. Instead, he argued (as he does here) that he should have received all incentive compensation generated by the team's accounts following Genoni's 2004 move to Philadelphia. He offered no clear justification for cutting off *all* Genoni's rights to team incentive compensation, other than repeatedly asserting (as he does here) that it was "his wages." *See* Ex. 12 at 16, 50, 128-29. *Compare* Complaint ¶¶ 22, 62, 68.

C. **Shaffer Moves Accounts to Divert Team-Account Production Credits from Genoni to Shaffer.**

Some time after Genoni's June 2004 move to Philadelphia, Shaffer became dissatisfied with the production-credit splits on team accounts. He claimed this was because Genoni agreed to continue seeking new clients for the team after moving to Philadelphia but failed to do so. *See* Ex. 10 at 200-01.

Genoni strongly disagreed. She asserted that she never agreed to continue working with Shaffer after her move to Philadelphia, maintaining that the production-credit splits were to

compensate her for her prior contributions in building the team's book of business. Ex. 2 at 133, 203-08. Such agreements were common. Indeed, both Shaffer and Genoni received continuing production-credit splits on numerous accounts managed by other FAs with no work by the Shaffer/Genoni Team. The team called these accounts "third-party administered accounts." Ex. 13 at 3; Ex. 14 at 30-31. Splits on those accounts compensated the Shaffer/Genoni Team for referring an account to the administering FA. *See* Ex. 14 at 30-31, 36-37, 131-32.

Genoni also contended that the circumstances surrounding her move made clear to Dullanty and Shaffer that she would not continue to find new clients to share with Shaffer. *See* Ex. 2 at 138-42. For example, Dullanty helped her arrange interviews with Philadelphia teams and both he and Shaffer knew that she had formed a new partnership after her move. *See id.* at 138-43; Ex. 15. Genoni's new Philadelphia manager (Charles Haraburda) signed a declaration stating his understanding (based on conversations with Dullanty and Genoni) that the Shaffer/Genoni team was dissolved (except for existing accounts). Ex. 16 at ¶¶ 7-9. He went on to observe that it is doubtful he would have hired Genoni into the Philadelphia office if he thought she would be developing business for the San Francisco office. *Id.* at ¶ 9. Genoni also pointed out that contemporaneous emails and Dullanty's arbitration testimony demonstrated Dullanty's understanding that the Shaffer/Genoni team was dissolving — in Dullanty's words, "for future business, they were going to go their separate ways." Ex. 12 at 180-187; Ex. 7 at 111; *see also* Ex. 17. Finally, Dullanty's suggestion that Shaffer and Genoni's agreement should be changed to incorporate sunset provisions on certain Shaffer/Genoni Team accounts further reflected his understanding that the two would not continue to work together. Indeed, he later questioned how Genoni could negotiate a better deal than the Team Compensation Agreement: "*Better terms than 50/50 for life with the other FA doing all the work?*" Ex. 4 at 5.

Whatever the reason for Shaffer's dissatisfaction with the deal he struck with Genoni, he decided to take matters into his own hands. He began covertly moving accounts from the Shaffer/Genoni Team's pooled production number (which generated 50/50 split production credits for Shaffer and Genoni) into his individual number (which assigned production credits only to him). *Id.* at 4-6; Ex. 2 at 149-54; Ex. 8 at 54-57. He did this many times and in a way

calculated to avoid detection — moving the accounts only briefly to allow production credits to register to his individual number and then putting the accounts back in the pooled number. Ex. 2 at 150-51. Dullanty described this as "very wrong." Ex. 4 at 7. Such moving of accounts was a terminable offense, and Dullanty severely reprimanded Shaffer for it. *See id.* at 6; Ex. 18 at 83-85.

### D. Merrill Lynch Works to Resolve the Shaffer/Genoni Dispute.

Approximately a year after she left for Philadelphia, Genoni discovered Shaffer's clandestine movement of accounts and complained about it. Ex. 2 at 149, 153-54. Shaffer responded by complaining that the production-credit splits in place were unfair to him. *See* Ex. 19. Merrill Lynch worked to help the two resolve their disputes. Its Philadelphia and San Francisco management teams spent countless hours trying to resolve the problem. *See* Ex. 18 at 55-56, 61, 70; Ex 8 at 120-21, 126-27, 129-30, 148-49. Merrill Lynch set up several mediations, with new disputes hampering efforts to bring the two together. Ex. 18 at 62-64; Ex. 20. Though Shaffer and Genoni did eventually participate in a mediation, they did not resolve their differences.

Following the failed attempts at mediation, Merrill Lynch developed its own resolution of Shaffer/Genoni Team dispute (the "Resolution"). As of January 1, 2008, the Resolution voided the written Team Compensation Agreement and any subsequent verbal agreements regarding Shaffer/Genoni production-credit splits. Ex. 13 at ¶ 5. It instead set out splits that differed according to account type. *Id.* at ¶ 1. It phased out Genoni's splits on Shaffer-legacy accounts by 2010, phased out splits on Genoni-originated accounts by 2014, and preserved their continuing split on third-party administered accounts. *Id.* Genoni and Shaffer were also required to share the costs of servicing accounts. *Id.* at ¶ 2.

### E. Shaffer Tries to Negotiate a More Favorable Resolution, and Then Decides to Leave Merrill Lynch.

Approximately four months after implementation of the Resolution, Shaffer approached his then-manager Brian Riley about amending its terms. Shaffer suggested that Merrill Lynch credit him 100% of the production credits on the Shaffer/Genoni Team accounts and then credit

Genoni whatever production credits it wished (paying the corresponding incentive compensation out of its own pocket). *See* Ex. 18 at 74-75; Ex. 8 at 91-92. Riley presented Shaffer's proposal for consideration, but Merrill Lynch decided to abide by the January 2008 Resolution. Ex. 18 at 75-76. At that point, Riley told Shaffer that the Resolution would be enforced and that Merrill Lynch felt confident about this decision. *See id.* at 76-77.

Shortly thereafter, Shaffer began interviewing with other financial services companies. Shaffer chose UBS Financial Services as his new employer, and UBS gave him an up-front forgivable loan of $1.9 million for joining the company. Ex. 14 at 12-13. On August 22, 2008, Shaffer resigned from Merrill Lynch. Ex. 8 at 94-95; Ex. 21. Over the next few weeks, he successfully convinced most of the Merrill Lynch clients he serviced to transfer with him to UBS. In September 2008, Genoni also resigned from Merrill Lynch. Ex. 14 at 227-29.

### F. Genoni Recovers Incentive Compensation from Shaffer — the Pennsylvania FINRA Arbitration.

In mid-2007, prior to implementation of the Resolution, Genoni filed an original and then an amended statement of claim with FINRA to arbitrate Pennsylvania state-law claims against both Merrill Lynch and Shaffer over the disputed incentive compensation following the Shaffer/Genoni Team dissolution. Ex. 9. Specifically, Genoni sought to enforce her right to incentive compensation under the Team Compensation Agreement, asserting claims for breach of contract, tortious interference, fraud, and violation of the Pennsylvania Wage Payment and Collection Act. *Id.* at 3-8. All of these claims arose from Shaffer's alleged violation of the written Team Compensation Agreement. She eventually dropped Merrill Lynch and pursued her claims only against Shaffer. Ex. 22 at 3.

In late May 2008, Shaffer responded by filing a complaint against Genoni in Pennsylvania state court, bringing claims for declaratory relief under the Pennsylvania Declaratory Judgments Act, breach of contract, fraudulent inducement, fraud, conversion, breach of fiduciary duty, and quantum meruit. Ex. 1 at 19 & Ex. B. A month later, Shaffer adopted his state-court complaint as his FINRA arbitration statement of claim. *Id.* at 19. Through it, he sought to recover from Genoni all of the incentive compensation she received under the terms of

the Team Compensation Agreement. *See id*. at Ex. B pp. 6-7, 13-14, 17-20.

Beginning nine months later, a panel of three FINRA arbitrators heard Shaffer and Genoni's competing claims over their compensation agreement. In spring 2009, the Panel held eight days of hearings in Philadelphia, Pennsylvania. *See* Ex. 23. The arbitration transcript spans some 2,000 pages. It includes testimony from seven witnesses, including Shaffer, Genoni, and Dullanty. *See id.* The panel received more than 140 exhibits. Ex. 24.

During the arbitration hearings, Genoni sought to recover from Shaffer (1) $65,448.05 in incentive compensation that she alleged was paid to Shaffer in 2008 when it should have been paid to her under the Team Compensation Agreement and/or the Resolution and (2) $163,620.13 to compensate her for the decrease in an up-front loan from her new employer as a result of Shaffer receiving that 2008 incentive compensation that should have gone to her. Ex. 12 at 201, 207-212. This total of $229,068.18 was to make her whole for incentive compensation she claimed under the Team Compensation Agreement and/or Merrill Lynch's Resolution. *Id*.

On the other hand, Shaffer tried to recover from Genoni $750,000 in incentive compensation from Shaffer/Genoni Team accounts that she received from 2004 to 2008 — the same incentive compensation he seeks to recover in this lawsuit. *Id.* at 16, 50, 128-29; Complaint ¶¶ 22, 62, 68. Exactly as he does in this case, Shaffer characterized that incentive compensation as "his wages." Ex. 12 at 16 (Shaffer's counsel asserting in closing argument that Genoni was paid "three-quarters of a million dollars out of Mr. Shaffer's paycheck"); *id.* at 50 (same, claiming Shaffer's "paycheck was docked for over three-quarters of a million dollars"); *id*. at 52 ("Shaffer's wages"); *id* at 68 ("his wages"). *Compare* Complaint ¶ 16 (alleging that 50% of Shaffer's wages had been "docked" and diverted to Genoni), ¶ 22 (alleging that $750,000 had been "docked" from Shaffer's wages). In short, he attacked the validity of the Team Compensation Agreement (and the subsequent verbal agreement that Dullanty testified should be enforced), arguing that Genoni was entitled to *nothing* under either agreement.

The FINRA arbitration panel rejected all of Shaffer's claims. First, it ordered Shaffer to pay Genoni compensatory damages of $229,068.18 — the exact amount she requested. Ex. 22 at 2, 3. This award necessarily reflected the panel's conclusion that Genoni was entitled to

the disputed incentive compensation on team accounts, as it compensated her for 2008 incentive compensation that she claimed was wrongfully paid to Shaffer instead of her. Ex. 12 at 201, 207-212. Moreover, the Panel dismissed Shaffer's counterclaims in their entirety. Ex. 22 at 3. Again, that dismissal can only mean that the Panel determined that Genoni, *not Shaffer*, was entitled to the incentive compensation she received from team accounts. Ex. 12 at 16, 50, 52, 68, 128-29; Ex. 1 at 1-7; *id.* at Ex. B. As such, it definitively rejected Shaffer's claim that such incentive compensation constituted "his wages." *Id.*; Ex. 22 at 3. The Panel, though it had the discretion to split the hearing fees between the parties, decided to assess all $22,725.00 in hearing session fees against Shaffer. Ex. 22 at 4; Ex. 25 at (a)(1).

### G. The California FACAAP Arbitration.

About a month after the Pennsylvania FINRA award sustaining Genoni's claims issued, Shaffer initiated a JAMS arbitration against Merrill Lynch in California. Shaffer sought to recover contingent, deferred-compensation benefits awarded him individually under Merrill Lynch's FACAAP plan (and two other plans), challenging the forfeiture of those benefits for competition as invalid under California law. Shaffer pursued contract and tort theories and, though Merrill Lynch agreed during the pendency of the proceeding to reinstate Shaffer's benefits, the arbitrator also awarded Shaffer tort damages and attorneys' fees. This Court confirmed the California FACAAP arbitration award on April 11, 2011. Case No. 11-cv-000303-CRB, Dkt. 48.

Though the FACAAP arbitration award discusses the Shaffer/Genoni dispute over team incentive compensation, the arbitrator (recognizing that this dispute was not at issue there) allowed only limited testimony on the topic and did not purport to determine its merits. Ex. 26 at 74-75, 88, 162-63. Genoni, for example, did not testify at all (though Shaffer did). *See id.* at 4; Ex. 27 at 244. The FACAAP award's commentary on the dispute thus necessarily reflects, to say the least, only Shaffer's side of the story.

### III. <u>DISCUSSION</u>

As discussed in detail below, because the FINRA arbitration took place in Pennsylvania, that state's law governs the arbitration award's effect. Under Pennsylvania law,

- 11-

MOTION FOR ORDER ON PRECLUSIVE
EFFECT OF PENN FINRA ARB AWARD
CASE NO. CV-10-03943

the award has non-mutual collateral estoppel effect, meaning that Merrill Lynch can assert issue preclusion against Shaffer if the award meets the collateral-estoppel requirements. It does. Shaffer (against whom preclusion operates) was a party to the arbitration proceedings. In those proceedings, he had a full and fair opportunity to litigate the issue of who was entitled to the incentive compensation from Shaffer/Genoni Team accounts following Genoni's move to Philadelphia. Indeed, both parties' statements of claims and eight days of FINRA arbitration hearings focused on only that issue. Those hearings, preceded by motion practice and extensive document discovery, included testimony by seven witnesses and more than 140 exhibits. The resulting arbitration award constitutes a final judgment on the merits under Pennsylvania law. That judgment unequivocally concludes that Genoni had a right to half of the incentive compensation generated by team accounts — no alternate interpretation makes sense. Consequently, the FINRA award conclusively resolves that issue in this proceeding under the principles of collateral estoppel/issue preclusion.

### A. Pennsylvania Law Determines the Preclusive Effect of the FINRA Award.

This Court's jurisdiction is based on diversity of citizenship under 28 U.S.C. section 1332. *See* Dkt. 1. Accordingly, the Court uses California state law to determine the Pennsylvania FINRA award's effects. *Jacobs v. CBS Broad. Inc.*, 291 F.3d 1173, 1177 (9th Cir. 2002). California law accords a judgment from another state the same preclusive effect as the laws of the state in which it was rendered. *Brinker v. Superior Court*, 235 Cal. App. 3d 1296, 1300 (1991) ("Under California law, both the validity and effect of a foreign judgment are governed by the laws of the state in which it is rendered."). The FINRA award was rendered in Pennsylvania (and, indeed, both parties brought claims under Pennsylvania law). Ex. 9; Ex. 1 at Ex. B. Pennsylvania law therefore determines the award's preclusive effect.

### B. The Pennsylvania FINRA Award Satisfies the Elements of Collateral Estoppel.

Pennsylvania law accords arbitration awards non-mutual collateral estoppel effect. *Witkowski*, 173 F.3d at 200 n.10. This means that a non-party can assert an arbitration award's issue-preclusive effects against a party to the arbitration proceedings. *Id.* Accordingly, Merrill

MOTION FOR ORDER ON PRECLUSIVE
EFFECT OF PENN FINRA ARB AWARD
CASE NO. CV-10-03943

Lynch can assert the FINRA arbitration award's issue-preclusive effect against Shaffer even though Merrill Lynch was no longer a respondent when the award issued, so long as it meets the collateral-estoppel elements.

Those elements include four requirements. First, the party against whom collateral estoppel is asserted (Shaffer) must have been a party to the arbitration. *Witkowski*, 173 F.3d at 199. Second, there must have been a final judgment on the merits. *Id.* Third, Shaffer must have had a full and fair opportunity in the arbitration to litigate the issue to be precluded in this case. *Id.* Finally, that issue must be identical to an issue decided in the arbitration. *Id.* Shaffer was a party to the FINRA arbitration, thus satisfying the first requirement.

### 1. The FINRA Award is a Final Judgment on the Merits.

"Under Pennsylvania law, arbitration proceedings and their findings are considered final judgments for the purposes of collateral estoppel." *Witkowski v. Welch*, 173 F.3d 192, 199 (3d Cir. 1999) (citing *Dyer v. Travelers*, 572 A.2d 762, 764 (Pa. Super. 1990), and *Ottaviano v. Southeastern Penn. Trans. Auth.*, 361 A.2d 810, 814 (Pa. Super. 1976)). In other words, Pennsylvania treats an un-appealed arbitration award as a "final, valid, judicial determination on the merits by a court of competent jurisdiction" and assigns to it the concomitant preclusive effects. *Dyer*, 572 A.2d at 207; *see also id.* ("An arbitration award from which no appeal is taken has the effect of a final judgment on the merits.").

### 2. Shaffer Had a Full and Fair Opportunity to Litigate.

The same counsel representing Shaffer in this lawsuit represented him in the FINRA proceedings. That counsel presented and cross-examined witnesses, made opening and closing arguments, submitted exhibits, made and responded to pre-hearing motions, and took discovery (which included Merrill Lynch producing over 18,000 pages of documents). In short, the arbitration process provided Shaffer with a more than adequate opportunity to press his claim that he had been wrongfully denied team-account incentive compensation.

The seven witnesses and 140 exhibits presented over eight days of hearings created a robust record, part of which is described above. From that record, the Panel resolved the parties' fundamental disagreement, which required it to answer one question: Was Genoni or

- 13-

MOTION FOR ORDER ON PRECLUSIVE
EFFECT OF PENN FINRA ARB AWARD
CASE NO. CV-10-03943

Shaffer entitled to the 50% of team-account incentive compensation in dispute?

### 3. The FINRA Award Actually and Necessarily Decided that Genoni was Entitled to the Incentive Compensation Shaffer Seeks to Recover Here.

As a review of the parties' statements of claims and closing arguments makes clear, Genoni and Shaffer each asked the FINRA Panel to rule that he or she had a right to the disputed 50% of team-account incentive compensation assigned to Genoni by the Team Compensation Agreement. Ex. 9; Ex. 1 at Ex. B; Ex. 12 at 15-212; *see also Witkowski*, 173 F.3d at 201-03. Genoni argued that she should receive that incentive compensation under the Team Compensation Agreement, but that she would also be entitled to it under Merrill Lynch's Resolution or the verbal agreement advocated by Dullanty. Ex. 12 at 207-12. She sought $229,068.18 in damages to compensate her for 2008 incentive compensation that she asserted had been erroneously given to Shaffer. *Id.* at 207-11; Ex. 22 at 2. Shaffer, on the other hand, vigorously contended that the Team Compensation Agreement was invalid and that *all* the team-account incentive compensation Genoni received following her departure belonged to him. Ex. 12 at 16-17, 117-18, 128. He argued — exactly as he does here — that three quarters of a million dollars in incentive compensation was taken out of "his paycheck" and given to Genoni, and he asked the FINRA panel to return that money to him. *Id.*

Yet, the FINRA award ordered Shaffer to pay Genoni exactly what she asked for – – $229,068.18. Ex. 22 at 2, 3. Because she requested that amount to compensate her for incentive compensation wrongfully paid to Shaffer instead of her, the award can only mean that the panel determined that she was entitled to her split of the incentive compensation on team accounts. Ex. 12 at 201, 207-212. Conversely, the Panel's complete dismissal of Shaffer's counterclaims necessarily reflects its conclusion that Genoni — not Shaffer — had a right to the disputed incentive compensation she received under the Team Compensation Agreement. Ex. 22 at 3; Ex. 12 at 16, 50, 128-29; Ex. 1 at 1-7; *id.* at Ex. B. The Panel's decision to assess *all* hearing fees (over twenty thousand dollars) to Shaffer further demonstrates its thorough rejection of his claim to the disputed incentive compensation as "his wages." Ex. 22 at 4; Ex. 25 at (a)(1).

No plausible reading of the FINRA award can alter the conclusion that Genoni had

a right to her share of team-account incentive compensation following the team's 2004 dissolution, whether under the Team Compensation Agreement, the alleged verbal agreement or the January 2008 Resolution. Here, as in *Witkowski*, it would be "an anomalous result" to have a judgment that the disputed incentive compensation belonged to Genoni while at the same time allowing Shaffer to again seek that very same incentive compensation — this time from Merrill Lynch. *See* 173 F.3d at 205-06. As in *Witkowski*, the determination that Genoni was entitled to the disputed incentive compensation "is necessarily fatal" to Shaffer's claim that Merrill Lynch should have paid that compensation to him. *See id.* at 206.

* * * * *

Because it satisfies every collateral-estoppel element, the FINRA award should govern in this case on the issue it actually and necessarily decided — the appropriate allocation of team-account incentive compensation between Genoni and Shaffer.

## IV. CONCLUSION

Merrill Lynch respectfully requests that this Court accord the Pennsylvania FINRA arbitration award the issue preclusive effect to which it is entitled in this proceeding. Specifically, it asks the Court to issue an order ruling that the arbitration award conclusively determined Genoni's entitlement to the incentive compensation that Shaffer sought to recover in that arbitration (and that he now seeks to recover here). Such an order will promote judicial economy by significantly narrowing the issues in this case, thus setting the stage for potential dispositive motions.

DATED: June 3, 2011

MUNGER, TOLLES & OLSON LLP

By: /s/ *Victoria L. Boesch*
        Victoria L. Boesch

Attorneys for Defendants
MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED and MERRILL LYNCH & CO., INC.