IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BRADFORD SHAFFER,<br><br>    Plaintiff,<br><br>    v.<br><br>MERRILL LYNCH, PIERCE, FENNER AND SMITH, INC.<br><br>    Defendant.<br>_____/ | No. C 10-03943 CRB<br><br>**MEMORANDUM AND ORDER (1) GRANTING MOTION FOR ORDER ON PRECLUSIVE EFFECT OF PENNSYLVANIA FINRA ARBITRATION; AND (2) DENYING MOTION FOR ORDER COLLATERALLY ESTOPPING DEFENDANTS BASED ON JAMS ARBITRATION** |

       Plaintiff Bradford Shaffer, a former Merrill Lynch ("Merrill") financial advisor, has brought suit against his former employer, alleging that Merrill discriminated against him on the basis of his sex when it resolved a wage dispute he had with another financial advisor, Saundra Genoni,[1] in Genoni's favor. Two motions are pending, each relating to the preclusive effect of a different arbitration on this case. In the first motion (the "FINRA motion"), Merrill asks the Court to find that the 2009 FINRA (Financial Industry Regulatory Authority) arbitration between Plaintiff and Genoni has preclusive effect on this case; in the second motion (the "JAMS motion"), Plaintiff asks the Court to find that many of the issues in this case were already determined in the JAMS arbitration, which the Court confirmed in

---

[1] Genoni's name for much of the time at issue was Gibson; for simplicity's sake, this Order will refer to her as Genoni.

April of this year. As explained below, the Court GRANTS the FINRA Motion and DENIES the JAMS Motion.

## I. BACKGROUND

### A. Employment Background

Plaintiff worked as a financial advisor at Merrill from 1986 until 2008. JAMS Mot. at 1. Plaintiff worked in San Francisco with his father, another long-standing Merrill financial advisor, on what was known as the "Shaffer Team." FINRA Mot. at 3. In 1995, Genoni joined the Shaffer Team. Id. In 1998 or 1999, Plaintiff and Genoni became romantically involved and eventually became engaged. Id. at 4. Plaintiff broke off the engagement, but the two continued to work together on the Shaffer/Genoni Team. Id. Plaintiff's father retired. Ex. 1 Ex. B ¶ 29. During this time, Plaintiff and Genoni agreed to split all production credits (analogous to commissions) from the Shaffer/Genoni Team 50-50. Id. ¶¶ 30-31.

In 2004, Genoni decided to transfer to Merrill's office in Philadelphia. FINRA Mot. at 4. Prior to Genoni's departure, she and Plaintiff entered into a written Team Compensation Agreement in which they agreed to continue a 50-50 split on all production credits generated by the accounts then serviced by the Shaffer/Genoni Team. Ex. 6. The Team Compensation Agreement, signed by Plaintiff, Genoni, and their Managing Director, James Dullanty, provided that the split could "only change on an existing account with consent of both parties." Id. ¶ 3. The Agreement was to remain in effect until one of the team members left Merrill. Id. ¶ 4.

Shortly after signing the Agreement, Dullanty asked that the parties modify the agreement. Id. at 135:20-137:12, 147. He spoke with Plaintiff and Genoni about changing it. Id.; Ex. 8 at 38. Plaintiff and Dullanty claimed that Dullanty voided the Agreement, but Genoni claimed that Dullanty only asked her to consider amending its terms. See Ex. 2 at 135-37, 144-48; Ex. 10 at 194-95; Ex. 7 at 25-27. Plaintiff and Dullanty asserted that, following their discussions, Plaintiff and Genoni reached a new verbal agreement. Ex. 7 at

101-102; Ex. 8 at 40.  Genoni testified that she considered the terms of the oral proposal, but decided to adhere to the Team Compensation Agreement.  Ex. 2 at 147-48.

Plaintiff became dissatisfied with the production credit splits on team accounts.  He testified that this was because Genoni had agreed to continue seeking new clients for the team in Philadelphia but failed to do so.  Ex. 10 at 200-201.  Genoni disagreed, asserting that the production credit splits were intended to compensate her for her prior contributions to the team.  Ex. 2 at 133, 203-208.  Plaintiff began to covertly move accounts from the Shaffer/Genoni Team's pooled production number, which resulted in a 50-50 split, to Plaintiff's individual number, which assigned all production credits to him.  Ex. 4 at 4-6; Ex. 2 at 149-54.  Dullanty described this as "very wrong," and Plaintiff was reprimanded for it.  Ex. 4 at 6-7; Ex. 18 at 83-85.

About a year after Genoni left for Philadelphia, she became aware of Plaintiff's moving of accounts, and complained about it.  Ex. 2 at 149, 153-54.  Plaintiff responded that the production credit splits were unfair.  Ex. 19.  Merrill tried to resolve the disputes, arranging several mediations between Plaintiff and Genoni.  Ex. 18 at 62-64; Ex. 20.  Plaintiff and Genoni were unable to resolve their differences.  FINRA Mot. at 8.

In January 2008, Merrill unilaterally voided the Team Compensation Agreement and any subsequent verbal agreements about the Shaffer/Genoni production credit splits.  Ex. 13 at ¶ 5.  Merrill imposed a Resolution in which the splits differed according to account type.  Id. ¶ 1.  Plaintiff characterizes the Resolution as "a cram down 'resolution' to satisfy" Genoni, which was presented to him as "a 'take it or leave it' proposition."  JAMS Mot. at 2.  In August 2008, Plaintiff resigned from Merrill.  Ex. 8 at 94-95; Ex.21.  He asserts that Merrill's Resolution "forced [him] to leave."  JAMS Mot. at 2.  Genoni left Merrill in September 2008.  Ex. 14 at 227-29.

### B.   The FINRA Arbitration

In mid-2007, before Merrill implemented the Resolution, Genoni filed a statement of claim with FINRA to arbitrate Pennsylvania state law claims against both Plaintiff and Merrill.  See generally Ex. 9.  She sought to enforce her right to incentive compensation

3

under the Team Compensation Agreement, asserting claims for breach of contract, tortious interference, fraud, and violation of the Pennsylvania Wage Payment and Collection Act. Id. at 3-8. Genoni subsequently dropped her claims against Merrill and only pursued relief against Plaintiff. Ex. 22 at 3.

In May 2008, Plaintiff filed a complaint against Genoni in Pennsylvania state court, asserting claims for declaratory relief under Pennsylvania law, breach of contract, fraudulent inducement, fraud, conversion, breach of fiduciary duty, and quantum meruit. Ex. 1 at 19 & Ex. B. A month later, he adopted this complaint as his FINRA arbitration claim. Id. at 19. That claim sought to recover from Genoni all of the incentive compensation she received under the Team Compensation Agreement. Ex. 1 at Ex. B at 6-7, 13-14, 17-20.

In Spring 2009, a 3-person FINRA arbitration panel held eight days of hearings about the dispute between Plaintiff and Genoni. Ex. 23. The arbitration involved testimony from seven witnesses, including Plaintiff, Genoni and Dullanty, and more than 140 exhibits; the transcript is over 2,000 pages. Id.; Ex. 24. The panel ultimately ordered Plaintiff to pay Genoni compensatory damages of $229,068.18. Ex. 22 at 2, 3. It further dismissed Plaintiff's counterclaims in their entirety. Id. at 3. However, it did not explain its reasoning.

### C. The JAMS Arbitration

A month after the conclusion of the FINRA arbitration, Plaintiff initiated a JAMS arbitration in California, in front of Judge Warren. In that arbitration, Plaintiff sought to recover long-term incentive compensation under three separate Merrill plans. See Order Granting Motion to Confirm (case no. 11-303, dkt. 44) at 2. When Plaintiff left Merrill to work for a competitor, Merrill had denied him benefits from the plans that had not yet vested. Id. Plaintiff alleged that Merrill thereby breached his contracts and, in enforcing the forfeiture provisions in the manner it did, interfered with his right to compete under California law. Id.

The JAMS arbitration "was an adjudicatory proceeding," "conducted in a judicial and adversarial manner," in which "witnesses were required to testify under oath," "the parties had all of the judicially accepted discovery rights," and a court reporter recorded the

proceeding. JAMS Mot. at 1. Genoni and Dullanty did not testify. Ex. 26 at 4; 27 at 244.

Following the hearing, Judge Warren issued a 56 page decision, which found:

- Merrill breached the three deferred payment Plans by failing to pay Plaintiff the amounts he was contractually due. Plaintiff was entitled to the amounts owed. Dkt. 57-1 Ex. 1 (Arbitrator's Final Award) at 54.

- Merrill's conduct of threatening to forfeit Plaintiff's benefits if he worked for a competitor of Merrill violated California law, and Plaintiff was thus entitled to $250,000 in emotional distress damages. Id. at 55.

- Merrill's conduct "in threatening [Plaintiff] if he exercised his employment rights, and then coercively depriving him money when he did so, was oppressive and fraudulent" and entitled Plaintiff to exemplary damages of $750,000. Id.

- Plaintiff was also entitled to attorneys' fees. Id. at 55-56.

This Court confirmed Judge Warren's decision on April 1, 2011. See generally Order Granting Motion to Confirm (case no. 11-303, dkt. 44).[2]

### D. Procedural Background

This suit began when Plaintiff filed a Complaint against Merrill in state court in January 2011. See dkt. 1 Ex. 1 (Complaint). The Complaint asserted (1) sex discrimination, (2) retaliation for refusal to surrender rights; (3) constructive and wrongful discharge in violation of public policy; (4) failure to timely pay wages in violation of public policy; (5) constructive and wrongful discharge to avoid paying wages in violation of public policy; (6) wrongful demand to surrender employment rights in violation of public policy. Id. Merrill removed to this Court on the basis of diversity jurisdiction. See dkt. 1 at 2.

## II. DISCUSSION

Two Motions are now pending, each relating to the preclusive effect of a different arbitration.

### A. FINRA Motion

In the first Motion, Merrill asks the Court to give the FINRA arbitration preclusive effect. See generally dkt. 43. As discussed below, the Court will do so.

//

---

[2] That Order dealt largely with Judge Warren's late-disclosed use of research attorneys – something not relevant to the present motions.

5

### 1. Legal Standard

As an initial matter, the Court must address which law applies to this Motion. The parties disagree on this matter, and a great deal of the motion hearing was taken up with arguing it.

Because this Court is sitting in diversity jurisdiction, it must follow California law. See Jacobs v. CBS Broad., Inc., 291 F.3d 1173, 1177 (9th Cir. 2002) ("Because this is a diversity action, state law controls whether the [proceeding at issue there] has a preclusive effect on Plaintiffs' claims"); Priest v. Am. Smelting & Ref. Co., 409 F.2d 1229, 1231 (9th Cir. 1969); Opp'n at 7 (conceding this). California law gives judgments from other states the same preclusive effect as the laws of the state in which those judgments were rendered. See Brinker v. Superior Court, 235 Cal. App. 3d 1296, 1299-1300 (1991) ("Under California law, both the validity and effect of a foreign judgment are governed by the laws of the state in which it is rendered"). The FINRA award was rendered in Pennsylvania (indeed, both parties brought claims under Pennsylvania law). It is as simple as that: Pennsylvania law governs.

Pennsylvania law provides that a non-party to an arbitration proceeding may assert an arbitration award's issue-preclusive effects against a party to an arbitration proceeding. See Witowski v. Welch, 173 F.3d at 200 n.10 (3d Cir. 1999) ("[m]utuality of the parties, once the rule, has now been abolished in Pennsylvania."). This is known as non-mutual collateral estoppel. See also Parkland Hosiery Co. v. Shore, 439 U.S. 322 (1979) (discussing concept). For issue preclusion to apply in Pennsylvania: (1) the issue decided in the prior adjudication must be identical with the one in the later action; (2) the prior adjudication must have been a final judgment on the merits; (3) the party against whom issue preclusion is asserted must have been a party or in privity with a party to the prior adjudication; and (4) the party against whom collateral estoppel is asserted must have had a full and fair opportunity to litigation the issue in the prior adjudication. Witowski, 173 F.3d at 199.

Plaintiff's arguments against the application of Pennsylvania law are unavailaing.

6

First, Plaintiff argues that Brinker only requires deference to another state's judgments, and that because the FINRA award was never confirmed, it is not entitled to full faith and credit. FINRA Opp'n at 7. That is incorrect. Under Pennsylvania law, an unappealed arbitration award has the effect of a final judgment on the merits, and is considered a final judgment for the purposes of collateral estoppel. See Witkowski v. Welch, 173 F.3d 192, 199 (3d Cir. 1999) (citing Dyer v. Travelers, 392 Pa. Super. 202 (1990)).[3]

Plaintiff argues next that under federal law, arbitration is not a "judicial proceeding" entitled to full faith and credit. See FINRA Opp'n at 7 (citing Dean Witter Reynolds, Inc. v. Byrd, 470 U.S. 213, 222 (1985)). But, in making this argument, Plaintiff relies on cases in which courts were exercising federal question – not diversity – jurisdiction. See Opp'n at 7 (citing Dean Witter Reynolds; Caldeira v. State of Cal., 866 F.2d 1175, 1178 (9th Cir. 1989); McInnes v. State of Cal., 943 F.2d 1088, 1092-96 (9th Cir. 1991)).[4]

Finally, Plaintiff argued strenuously at the motion hearing that the Court may not apply Pennsylvania law because Pennsylvania law permits non-mutual collateral estoppel, and California has a strong public policy against it. Plaintiff relied entirely on Vandenberg v. Superior Court, 21 Cal. 4th 815 (1999) for this point. The Court has carefully reviewed Vandenberg and finds it entirely consistent with the Court's determination here. Vandenberg holds that in California, unless arbitration agreements specify to the contrary, they do not

---

[3] Incidentally, although it is true that the Award was not confirmed, it is also true that Plaintiff did not move to vacate it. Plaintiff has represented that he "did not move to vacate" the FINRA Award "[b]ecause of its ambiguous and puzzling determination and the absence of any clue as to the issues or causes of action on which the Arbitrators intended, if they did, to rule." See Edlund Decl. ¶ 11. This assertion makes little sense to the Court. Whatever other questions Plaintiff had about the FINRA Arbitration Award, he should have understood it as a defeat. If he thought that it was wrong, or "puzzling," nothing prevented him from moving to vacate it.

[4] Similarly, Scott v. Snelling, Inc., 732 F. Supp. 1034, 1039 (N.D. Cal. 1990), which Plaintiff cites for the proposition that "under California law, an arbitrator's award does not constitute a 'final judgment' which would enable a party to invoke the doctrine of collateral estoppel," is distinguishable. There, the court was applying California preclusion law. Here, California law instructs that "both the validity and effect of a foreign judgment are governed by the laws of the state [here, Pennsylvania] in which it is rendered." See Brinker, 235 Cal. App. 3d at 1299-1300. Under Pennsylvania law, an unconfirmed arbitration award does constitute a final judgment. See Witkowski, 173 F.3d at 199. Although it will not apply California preclusion law herein, the Court further notes that more recent California law has held that "it is also appropriate to give collateral estoppel effect to findings made during an arbitration, so long as the arbitration had the elements of an adjudicatory procedure." See, e.g., Kelly v. Vons Cos., Inc., 67 Cal. App. 4th 1329, 1336 (1998).

7

have non-mutual collateral effect. See Vandenberg, 21 Cal. 4th at 836-37 ("Accordingly, we adopt, for California purposes, the rule that a private arbitration award cannot have nonmutual collateral estoppel effect unless the arbitral parties so agree."). In that case, the Supreme Court of California defined the scope of judgments arising out of California proceedings, see id. at 828-38, something it has a significant interest in doing. Vandenberg does not address the scope of judgments arising out of Pennsylvania proceedings – nor could it, given the law of full faith and credit. See Brinker, 235 Cal. App. 3d at 1299-1300.[5] Because the Court here is tasked with determining the scope of a judgment arising out of a Pennsylvania proceeding, the Court must defer to the courts of Pennsylvania.

Accordingly, the Court will apply Pennsylvania law.

### 2. Discussion of FINRA Motion

Merrill's Motion turns largely on whether the issue decided in the FINRA arbitration is identical with the one in this action. See id. Merrill argues that in the FINRA arbitration, "Genoni and [Plaintiff] each asked the FINRA Panel to rule that he or she had a right to the disputed 50% of team-account incentive compensation assigned to Genoni by the Team Compensation Agreement." FINRA Mot. at 14. Because the FINRA award gave Genoni "exactly what she asked for – $229,068.18 . . . the award can only mean that the panel determined that she was entitled to her split of the incentive compensation on team accounts." Id. Merrill finds further support in the award's dismissing of Plaintiff's counterclaims and assessing of all of the hearing fees to Plaintiff. Id. Plaintiff disagrees, arguing that "[t]he FINRA Arbitration did not determine anything about which cause of action or actions, if any, were the basis for their Award, or whether the Award was predicated on contract, tort, fraud, or some other claim by Genoni." FINRA Opp'n at 3-4.

Plaintiff is correct that the FINRA Panel did not provide an explanation for its Award.[6] The Award listed the parties' counsel, the procedural history of the case, the various

---

[5] Thomas v. Washington Gas Light Co., 448 U.S. 261 (1980), does not hold otherwise.

[6] According to Plaintiff's counsel, FINRA's arbitration rules do not require any reasoned decision or explanation of decision unless all parties request it. Edlund Decl. ¶ 6.

8

causes of action asserted, and the relief requested.  See Boesch Decl. Ex. 22.  It recounted that Genoni had initially sought, among other things, compensatory damages of $500,000, that Plaintiff requested compensatory damages of $1,200,000 in his Counterclaim, that in her Reply to the Counterclaim, Genoni sought $1,500,000 in compensatory damages, and that at the hearing Genoni requested compensatory damages of $229,068.18.  Id. at 2 of 5.  The Award then concluded:

> After considering the pleadings, the testimony and evidence presented at the hearing, the Panel has decided in full and final resolution of the issues submitted for determination as follows:
>     1. [Plaintiff] is liable for and shall pay to [Genoni] compensatory damages in the amount of $229,068.18.
>     2. [Plaintiff's] Counterclaim is dismissed in its entirety.
>     3. Any and all relief not specifically addressed herein, including punitive damages, is denied.[7]

Id. at 3 of 5.  Plaintiff's counsel declares that not only did the Award contain no explanation for its damages determination, but that, throughout the proceeding, there were no "comments, rulings, determinations or suggestions by any of the Arbitrators to explain, describe or relate to any reasons for their Award."  Edlund Decl. ¶ 4.  Thus, here, as in Witowski, the Award is "not a model of clarity as to what was and was not decided."  173 F.3d at 202.

Nonetheless, following Witowski, the Court can look to "the framing of the issues before the arbitrator and the record created during such proceedings" to "inform this Court's analysis of what the arbitrator's ultimate award means."  Id. at 202-203; see also Business and Commercial Litigation in Federal Courts 2d § 13:20 (Haig ed., 2005) ("A court may, however, draw reasonable inferences from the issues raised in the prior litigation where no express findings were made by the court in the earlier litigation").  Two documents are particularly helpful in this effort: Genoni's FINRA statement and her closing argument.

Genoni's FINRA statement alleges breach of contract, tortious interference with contract, tortious interference with economic advantage, fraud, and a violation of Pennsylvania Wage Payment and Collection Act.  Boesch Decl. Ex. 9 at 7.  The vast majority of the statement discusses the Team Compensation Agreement and Plaintiff's violation of

---

[7] The Panel also assessed the hearing session fees to Plaintiff.  Id. at 4 of 5.

9

1 that Agreement. See id. at 3-5 (describing Plaintiff's moving assets from the pooled number
2 to his individual number, as his having "stole[n] production credits from the pool."). Id. at 5.

3       In her closing argument, Plaintiff asserts that Genoni "made varied arguments,"
4 including that Genoni should win because Plaintiff was a "thief," that she was a "victim,"
5 because she had "premature delivery of her second child" due to the stress caused by
6 Plaintiff, that she "still loved" Plaintiff, that Plaintiff "stole" thousands of dollars from her.
7 FINRA Opp'n at 6 (citing Boesch Decl. Ex. 12 at 135-82). Plaintiff quotes those bits and
8 pieces accurately enough from Genoni's closing argument, but they are not why Genoni said
9 that she should win. See, e.g., Boesch Decl. Ex. 12 at 138:21-1394 ("only after Mrs. Genoni
10 had gone into premature delivery two months early with one of her children, only after Mrs.
11 Genoni went through tremendous stress, and then finally was able to start to track some of
12 these commissions that had been lost and stolen, did Mr. Shaffer first raise this issue"); id. at
13 135:18-136:4 (describing Plaintiff's moving accounts from the shared number to Plaintiff's
14 own number as having "stole[n] hundreds of thousands of dollars in commissions . . . in
15 flagrant violation of any contract").

16       Genoni's closing argument urged that she should win because "Whatever agreement
17 you look at, the written agreement, the verbal, the resolution, whatever it is, Mrs. Genoni is
18 entitled to her commissions, to her half." Id. at 199:17-21. Genoni's counsel was fairly
19 specific as to how he arrived at Genoni's final damages request. See id. at 207:20-22 ("Let's
20 talk about Mrs. Genoni's damages. I want to explain where these numbers come from.").
21 That number was not based on either her child's premature delivery or a broken heart, but on
22 the disputed production credits. Counsel explained, "We're suing on the team compensation
23 agreement," id. at 208:1-2, but added that Merrill's Resolution only changed the payment
24 periods, id. at 208:7-8, and so "either way, either under the resolution which continues her
25 entitlement to get paid or the team compensation agreement, she's entitled to money," id. at
26 208:16-20. Counsel continued:

27
28 > [Plaintiff] was overpaid this in commissions, 163,000, and at a 40 percent payout, it would net 65,448.05. That's the money from a commission standpoint, only '98, not '07. . . .

10

> [Plaintiff], because he got paid too many commissions got . . . just in '08 he got $163,620.13 more in his note. And Mrs. Genoni – actually, he got paid 150 percent; so, he got paid more than that. But Mrs. Genoni got a hundred percent, got $163,620.13 less than what she was entitled to. . . .
>
> That's what we're talking about, that [Plaintiff] has gotten double payments on commissions, and he's gotten double payments on the loan. If you total those two up – by the way, since [Plaintiff] got an up-front deal of 150 percent as opposed to a hundred percent, [Plaintiff] actually got 163,000 times another by half; so, it's more like 240,000 [Plaintiff] got in excess on his loan. But, since Mrs. Genoni only got a hundred percent loan, we're asking for $163,620. So, if you total those two up, that's 229,068.18.

Id. at 209:12-211:5. The Panel took this argument into account in its Award, noting that Genoni had requested compensatory damages of $229,068.18 at the hearing. Boesch Dec. Ex. 22 at 2 of 5.

Merrill's argument that the award of $229,068.18 means that "the Panel decided that the disputed production credits belonged to Genoni," FINRA Reply at 6-7, is therefore correct. The panel did not pick that number out of thin air; it picked precisely the number Genoni requested based on her lost production credits – to the penny. Although the panel did not state whether its $229,068.18 award derived from finding a breach of contract, tortious interference with contract, tortious interference with economic advantage, fraud, or a violation of Pennsylvania Wage Payment and Collection Act, or all of the above, at the very least the panel decided that Genoni was entitled to the $229,068.18 of production credits that she argued had been wrongfully paid to Plaintiff.[8]

But Plaintiff argues that the FINRA Award "was not a determination that the Arbitrators actually decided that Merrill was entitled to dock [Plaintiff's] pay by 50%, or that Merrill did not wrongfully withhold wages from [Plaintiff], or that Merrill had not wrongfully discharged him or that Merrill did not violate the laws against sex discrimination

---

[8] For this reason, this case is distinguishable from In re Hartmann, No. 10-31429 MER, 2011 WL 2118870 (Bankruptcy D. Colo. 2011), where a party argued that the other side was precluded from asserting claims against him because the matter was litigated in his favor in a FINRA arbitration. There, like here, the FINRA award did not specify the basis for the award, and because there were numerous causes of action, "it was impossible for the Court to determine whether all of these claims were actually determined." Id. at *3. Here, while it would be impossible for the Court to determine whether the Panel found a breach of contract as opposed to tortious interference with contract, etc., the Panel necessarily found that, based on one or all of those legal bases, Genoni was entitled to the $229,068.18 of production credits.

11

or that [Plaintiff] was not entitled to damages against Merrill." FINRA Opp'n at 4. Those are arguments for another day. Yes, Plaintiff's current claims against Merrill – for sex discrimination, retaliation, constructive discharge, etc. – raise numerous issues not addressed in the FINRA arbitration between Plaintiff and Genoni. But "[w]hatever other issues [Plantiff's] current claims also raise, they certainly raise" the issue of whether Genoni or Plaintiff was entitled to the disputed portion of the Shaffer/Genoni Team production credits following the dissolution of the Team. Id. at 8; see also Compl. ¶ 7 ("In connection with its goal of avoidance of a discrimination claim by [Genoni], Merrill diverted approximately 50% of [Plaintiff's] wages and paid those wages to [Genoni]."); ¶ 12 ("[Genoni] demanded that Merrill pay her 50% of [Plaintiff's] wages in accordance with the voided Agreement").[9] In awarding Genoni compensatory damages of $229,068.18, the FINRA Panel necessarily found that Genoni was entitled to 50% of the Team's production credits.

Plaintiff additionally argues that he "had no opportunity, much less a full and fair opportunity, to litigate the issues in question in this case" in the FINRA case. FINRA Opp'n at 4.[10] Plaintiff argues that because Merrill was not a party to the FINRA arbitration, he would have presented "a much different case" with "much different evidence," although the Court observes that he does not describe that evidence. See id. This is simply another way of arguing that the issues in the two cases are different. As just discussed, although many of the issues are different, the single issue that is the subject of this Motion – whether Genoni or Plaintiff was entitled to the disputed production credits – is identical.

The Court therefore finds this issue precluded.

---

[9] This case is therefore also distinguishable from Kelley v. TYK Refractories Co., 860 F.2d 1188, 1195 (3d Cir. 1988), in which the lack of identity of the issues was "manifest in the absence in the first adjudication . . . of any reference to facts relating to the central concern of the second action." Here, whatever other facts Plaintiff wishes to raise in this action as to Merrill's conduct and its motives, the issue of whether Plaintiff or Genoni is entitled to the team account production credits relies on the same facts in both cases. See also Spyridakis v. Riesling Group, Inc., 398 Fed. Appx. 793, at **4 (3d Cir. 2010) (distinguishing Kelley on same basis).

[10] Plaintiff also argues that Merrill assured the arbitrators in the FINRA case that its presence was unnecessary, and therefore it is unfair for Merrill now to be able to use that judgment against Plaintiff. FINRA Opp'n at 8-9. This argument has no merit: Pennsylvania law allows non-mutual collateral estoppel. See Witowski, 173 F.3d at 200 n.10.

12

### B.   JAMS Motion

In the second Motion, Plaintiff asks the Court to give the JAMS arbitration preclusive effect.  See generally dkt. 40.  As discussed below, the Court declines to do so.

#### 1.   Legal Standard

As Plaintiff argues, "[a]pplication of either California or federal standards results in the same analysis and results." JAMS Mot. at 8.  Thus, under California law, issue preclusion applies when (1) the person against whom the issue is asserted was a party or was in privity with a party to the prior adjudication; (2) there was a final judgment on the merits in the prior action; and (3) "the issue necessarily decided in the prior adjudication is identical to the one that is sought to be relitigated." See Roos v. Red, 130 Cal. App. 4th 870, 879 (2005).  Courts further "consider whether the party against whom the earlier decision is asserted had a 'full and fair' opportunity to litigate the issue." Id. at 880.  The federal standard is the same.  See Af-Cap. Inc. v. Chevron Overseas (Congo) Ltd., 475 F.3d 1080, 1086 (9th Cir. 1007); Kendall v. Visa U.S.A., Inc. 518 F.3d 1042 (9th Cir. 2008).

#### 2.   Discussion of JAMS Motion

Here, there is no question that Plaintiff is the same party as in the JAMS arbitration, or that the JAMS arbitration was a final judgment on the merits.  The questions are instead whether the issues Plaintiff identifies were "necessarily decided in the [JAMS arbitration]" and "identical to the one[s sought] to be relitigated," as well as whether Merrill had a "full and fair" opportunity to litigate them.  See Roos, 130 Cal. App. 4th at 879.

Plaintiff asks the Court to find that 34 issues that were determined in the JAMS arbitration should be given preclusive effect here.  Those issues fall into nine categories: (1) Shaffer Left Merrill Due to Merrill's Failure to Pay Shaffer His Earned Income, JAMS Mot. at 2, (2) Shaffer's Compensation Was Wages, id. at 3, (3) Merrill Acted in Bad Faith and Contrary to its Stated Corporate Principles, id. at 3, (4) Merrill Engaged in Economic Coercion, While Shaffer Attempted in Good Faith to Resolve the Diverted Income Issue, id. at 4, (5) Diversion of Shaffer's Income to Genoni Continued for Years, id. at 5, (6) Shaffer Reasonably Concluded Merrill's Conduct Was Oppressive, id. at 6, (7) Merrill's Conduct

was Oppressive, Fraudulent and Malicious as to Shaffer Regarding the Diverted Income, <u>id.</u> at 6, (8) Merrill Misused its Financial Resources and Leverage, <u>id.</u> at 7, and (9) Merrill Did Not Try to Help Shaffer, <u>id.</u> at 7.

Plaintiff's list of issues loses sight of what the JAMS arbitration was about. As the first page of Judge Warren's Award sets out, the JAMS arbitration was about Plaintiff's entitlement to "payments under the three Merrill Deferred Compensation Plans." JAMS Reply Ex. 1 (JAMS Award) at 1-2. When Plaintiff left Merrill and went to work for UCB, a direct competitor of Merrill's, Merrill informed Plaintiff that he had forfeited the unvested portions of the deferred compensation Plans, based on forfeiture provisions in the Plans. <u>Id.</u> at 2. Plaintiff initially only sought to be reimbursed for his entitlement under the Plans, then amended his demand to include claims for tort damages under Sections 52.1 and 3294 of California's Civil Code. <u>Id.</u> at 5. Judge Warren found that Plaintiff "base[d] his July 24, 2011claims for damages only on Merrill's alleged enforcement of the Plans' forfeiture clauses" – which Plaintiff argued, and the arbitrator ultimately found, was improper – "<u>not on any other aspect of his employment with Merrill</u>," noting that "the claim could not be brought but for the language in the Plans." <u>See</u> Boesch Decl. Ex. 28 at 4 (emphasis added).[11]

In advance of the Arbitration, Judge Warren clarified his jurisdiction. He ruled that "the Plans in question provide that JAMS has jurisdiction to resolve 'any claim or dispute concerning [Claimant's] rights or entitlements under <u>or otherwise related to</u> . . . 'the Plans." <u>Id.</u> at 5 (emphasis in original).[12] He went on to hold that he lacked jurisdiction to resolve issues related to the Shaffer/Genoni Team production credit dispute:

> Much has been made, in the papers and during oral argument, about the role that the Commission Split Agreement and/or the FINRA Arbitration will play in this case. As the Arbitrator indicated during the phone conference and as he reiterates here, the answer is "Not Much." Based on the Arbitrator's limited understanding of the facts in this case, the Commission Split Agreement and/or the FINRA Arbitration appear to be <u>relevant only to the extent that they help delineate or define the income that Claimant</u>

---

[11] In light of these and similar pronouncements at the JAMS arbitration, Plaintiff's suggestion at the motion hearing that the tort claim encompassed the dispute over the production credits is therefore not credible.

[12] This is consistent with Plaintiff's JAMS arbitration demand, which cited the Plan's arbitration clause as the basis for JAMS jurisdiction. <u>See</u> Dkt. 41 Ex. A at 3 of 10.

14

<u>actually made during his supposedly unwilling employment with Merrill Lynch. Neither the merits nor the factual or legal correctness of the Agreement or the Arbitration appear otherwise relevant to any issue in this case.</u> Respondent claims that the existence of the Commission Split Agreement is relevant to show the real reason why Claimant left Merrill. That may be so, but whether the Agreement was properly or fairly entered into in the first place (*e.g.*, the merits of the Agreement) does not appear pertinent to the present dispute. Relevancy is an issue that will ultimately be resolved at the hearing based on the state of the record at that time. . . . The validity of the Agreement or the correctness of the FINRA Arbitration will not be relitigated here.

Id. at 5-6 (emphasis added).

In the Award itself, Judge Warren revisited the relevancy of "the Genoni Dispute," explaining that Plaintiff asserted that he "became exasperated by Merrill's handling of it," and that "had he known that he could leave Merrill with no forfeiture penalty he would have done so 'in a second.'" JAMS Reply Ex. 1 at 23. Because Plaintiff did not leave earlier, Judge Warren explained, Plaintiff sought "damages for the difference between what he actually made at Merrill (taking into account the monies that he didn't receive because of the Genoni Dispute), plus consequential damages such as fees paid to outside law firms to address the Genoni affair, fees that otherwise would not have been incurred because the Genoni Dispute would have dissolved with his departure." Id. Judge Warren found that "the issue need not be addressed" because Plaintiff "did not establish that he would have left Merrill any earlier than he actually did, regardless of whether or not he knew the forfeiture clauses were void." Id.

However, in reaching that conclusion, Judge Warren discussed (and allowed testimony pertaining to) Plaintiff's subjective reasons for leaving Merrill, see, e.g., Boesch Decl. Ex. 26 at 88:13-16 (Judge Warren instructing counsel that "the Genoni matter can come in for reasons that we discussed earlier. But all of the details about what was and wasn't fair is not as relevant as the fact that it existed"),[13] which inevitably included

---

[13] See also id. at 162-63 (Judge Warren limiting testimony about Genoni Dispute: "we're not going to follow this road"); Ex. 30 at 10-11 (Plaintiff's counsel stating that the Team Compensation Agreement was cancelled, arguing "the validity of that cancellation is neither an issue nor relevant in this proceeding. The only relevant point is that there was a dispute between Merrill, [Plaintiff], and when Ms. Genoni changed her views about the agreement when she got to Philadelphia, and at that time Merril began shorting, in our view, [Plaintiff's] paycheck by 50 percent and paying those funds to Ms. Genoni").

15

1  discussion of Plaintiff's unhappiness with the Genoni Dispute, see, e.g., JAMS Reply Ex. 1
2  at 25 ("Claimant convincingly and graphically described the difficulties that the Genoni
3  Dispute was creating for his life"); id. at 30-31 ("Claimant departed, stating that Merrill's last
4  position on the Genoni Dispute was the 'straw that broke the camel's back"). The Award
5  even includes some of Plaintiff's subjective beliefs about what was driving Merrill's conduct
6  in the Genoni Dispute. For example, the Award states:

> Claimant thought the had a fairly good idea of the reasons behind Merrill's ineffective handling of his problem, which added considerably to his anxiety. Merrill was at the time involved in a number of lawsuits brought by female employees dealing with sexual harassment and discrimination, and apparently Merrill feared that alienating Genoni would make it more likely that she would sue them.

10 Id. at 27. But that is not the same as Judge Warren making a factual determination that
11 Merrill was, in fact, motivated by a fear of being sued by Genoni. Or that Plaintiff's other
12 subjective beliefs had been conclusively proven. Such a finding would neither be relevant to
13 the issues in the JAMS arbitration, nor within JAMS's jurisdiction.
14      Merrill therefore argues that (1) issues relating to the propriety of payments under the
15 Team Compensation Agreement were not "necessarily decided" in the JAMS arbitration; (2)
16 because of the express limitation on the jurisdiction of the JAMS arbitration, Merrill did not
17 have a "full and fair" opportunity to litigate the propriety of payments under the Team
18 Compensation Agreement – for example, the testimony of Genoni and Dullanty was not
19 relevant to the Plans, and neither testified; and (3) because the only issues in the JAMS
20 arbitration involved whether Merrill improperly forfeited Plaintiff's benefits under the non-
21 compete provisions in his deferred compensation plans, those issues are not "identical" to the
22 issues in this suit. JAMS Opp'n at 1-2.
23      The Court agrees. Although Plaintiff protests that "[c]ollateral estoppel 'jurisdiction'
24 is a new invention by Merrill," JAMS Reply at 1-2, there is nothing new in holding that issue
25 preclusion is only appropriate where "the issue [was] necessarily decided in the prior
26 adjudication," that the issues must be "identical to the one that is sought to be relitigated,"
27 and that the party against whom the earlier decision is asserted must have had a 'full and fair'
28 opportunity to litigate the issue," see Roos, 130 Cal. App. at 879-80. The issues that Plaintiff

points to do not meet this test. Issues relating to the propriety of Merrill's actions as to the Shaffer/Genoni Team's production credit dispute were not necessary to (or relevant to, or within the jurisdiction of) the JAMS arbitration. See People v. Neely, 70 Cal. App. 4th 767, 783 (1999) (collateral estoppel doctrine does not extend to dicta). Because the merits of Merrill's handling of the production credit dispute were not at issue in the JAMS arbitration, Merrill did not have a full and fair opportunity to litigate them there. And issues relating to Merrill's misconduct as to the Plans – although central to the JAMS arbitration – are not the same issues presented in this case, which asks, chiefly, whether Merrill's paying of team compensation to Genoni constituted sex discrimination against Plaintiff.

The Court therefore finds that these issues are not precluded.

## III.  CONCLUSION

For the foregoing reasons, the Court GRANTS the FINRA Motion and DENIES the JAMS Motion.

**IT IS SO ORDERED.**

Dated: July 25, 2011

CHARLES R. BREYER
UNITED STATES DISTRICT JUDGE